UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SABA CAPITAL CEF
OPPORTUNITIES 1, LTD., *et al.*,

                        Plaintiffs,

                -v-

NUVEEN FLOATING RATE INCOME
FUND, *et al.*,

                        Defendants.

21-CV-327 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

        Plaintiffs Saba Capital Management and Saba Capital CEF Opportunities 1, Limited (collectively, "Saba") bring this action against Defendants, a collection of closed-end Massachusetts business trusts and their trustees (collectively, the "Trusts"), alleging that Defendants' adoption of a "control share" provision violated Section 18(i) of the Investment Company Act of 1940 ("ICA"). The Trusts move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Saba opposes the motion and separately moves for summary judgment. For the reasons that follow, the Trusts' motion is denied and Saba's motion is granted.

I.    **Background**[1]

        Saba Capital Management is a limited partnership organized under the laws of Delaware with its principal place of business in New York. (Dkt. No. 1 ¶ 5; Dkt. No. 46 ¶ 1.) Saba Capital Management is the investment manager of Saba Capital CEF Opportunities 1, Limited ("Saba CEF 1"), and other investment funds. (Dkt. No. 1 ¶ 5; Dkt. No. 46 ¶ 8.) The Trusts are closed-

---

[1] The following facts, drawn from both the complaint and the parties' Rule 56.1 statements, are not in dispute.

end Massachusetts business trusts. (Dkt. No. 1 ¶¶ 7–21; Dkt. No. 46 ¶ 3.) Saba CEF 1 and the other investment funds managed by Saba Capital Management are collectively the beneficial owners of at least 9.9% of the total shares of each of the Trusts. (Dkt. No. 1 ¶ 5; Dkt. No. 46 ¶¶ 8–12.)

On October 5, 2020, each of the Trusts adopted amended bylaws (the "Bylaws"). (Dkt. No. 1 ¶ 26; Dkt. No. 46 ¶ 7.) Among the provisions added to the Bylaws was Article IX, titled "Control Share Acquisition" (the "control share amendment"). (Dkt. No. 1 ¶ 26; Dkt. No. 46 ¶ 7.) The control share amendment defines a "control share acquisition" as a shareholder's acquisition of shares after the date of the Bylaws' enactment which, taken together with shares already owned by that shareholder before the Bylaws' enactment, would lead to that shareholder's owning 10% or more of the total shares of a trust. (*See* Dkt. No. 40-9 at 32.) Under the control share amendment, this "control shareholder" cannot vote her stock acquired after the Bylaws' enactment unless authorized by an "affirmative vote of the holders of a majority of all of the Shares entitled to vote . . . excluding [any shares owned by a control shareholder]." (Dkt. No. 40-9 at 36.) The Bylaws do not subject the voting rights of stock owned by non-control shareholders to this restriction.

In response to the control share amendment, Saba filed this action on January 14, 2021, seeking recission of the control share amendment as violative of the ICA and a declaratory judgment that the control share amendment is illegal.[2] (*See* Dkt. No. 1.) *See also Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (holding that the ICA "creates an implied private right of action for a party to a contract that violates the ICA to seek rescission

---

[2] Saba also asserted a derivative claim but acknowledges that it is now moot. (*See* Dkt. No. 44 at 41.)

of that violative contract"). The Trusts moved to dismiss the action on March 30, 2021. (*See* Dkt. No. 38.) Saba then moved for summary judgment on April 30, 2021. (*See* Dkt. No. 43.)

## II.   Motion to Dismiss

### A.   Legal Standard

To overcome a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In resolving a motion to dismiss, the court "must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Doe v. Indyke*, 457 F. Supp. 3d 278, 282 (S.D.N.Y. 2020) (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### B.   Discussion

#### 1.   Rescission

Section 18(i) of the ICA requires that every share of stock issued by a registered management company, like the Trusts here, "be a voting stock and have equal voting rights with every other outstanding voting stock." 15 U.S.C. § 80a-18(i). Saba contends that the control share amendment transgresses both of these requirements. Since control shareholders cannot vote their newly acquired stock unless it is authorized by a vote of the holders of the majority of the non-control shares, Saba argues that the control share amendment would impermissibly convert some stock into non-voting stock — either temporarily or permanently if the

3

amendment's conditions are unmet. (*See* Dkt. No. 44 at 29–30.) Further, Saba maintains that the amendment creates unequal voting rights among stock because stock owned by non-control shareholders is not subject to the amendment's voting conditions. The Trusts counter that Saba misunderstands what the amendment does: The control share amendment affects the *ability* of control shareholders to exercise their stocks' voting rights, *not* the actual voting rights of the stock. The Trusts assert that the amendment does not strip voting rights from any stock or create unequal voting rights among stock. The Trusts liken this distinction to suspending the license of a driver who owns a validly registered car, which would legally prevent the driver from operating the car but would not affect the car's registration. If the driver gave the car to someone with an active license, that person could operate the car legally since the status of the car's valid registration never changed. (*See* Dkt. No. 49 at 13.) Similarly, the Trusts point out that anyone who receives stock transferred from a control share can fully exercise the voting rights of the stock (as long as the recipient does not acquire a control-share quantity of stock) and that the stock's voting rights would be identical to any other stock's rights.

Based on how the ICA defines "voting security," Saba has the better of the argument on Section 18(i)'s requirement that all stock be "voting stock." The ICA defines "voting security" as "any security *presently* entitling the owner or holder thereof to vote for the election of directors of a company." 15 U.S.C. § 80a-2(a)(42) (emphasis added). Within the same section defining terms throughout the Act, the ICA defines "security" to include stock. 15 U.S.C. § 80a-2(a)(36). The control share amendment thus violates Section 18(i)'s requirement that every stock issued be voting stock. When a shareholder acquires new stock in one of the Trusts, and the total amount of her stock in that trust constitutes a control share, her newly acquired stock does not presently entitle her to vote. Instead, whether a control shareholder's newly acquired

stock entitles her to vote is contingent on an uncertain future event — whether the holders of the majority of stock, excluding stock owned by control shareholders, authorize it. (Dkt. No. 40-9 at 36.) ("If voting rights of the beneficial owners of Common Shares acquired in a Control Share acquisition are not authorized . . . such beneficial owner shall not be 'entitled to vote' such Common Shares."). The plain language of the ICA makes this contingency impermissible.

The Trusts' arguments against applying the plain language of the ICA are unpersuasive. The Trusts first contend that it is "tenuous" to rely on the ICA's definition of "voting security" to interpret Section 18(i) because Section 18(i) uses the term "voting stock." (Dkt. No. 39 at 13 n.7.) But that argument is contradicted by the ICA itself, which defines "security" to encompass "stock." 15 U.S.C. § 80a-2(a)(36). In the alternative, the Trusts note that the ICA's provided definitions apply "unless the context otherwise requires," 15 U.S.C. § 80a-2(a), asserting that the context here requires interpreting "voting stock" as distinct from "voting security." Interpreting "voting stock" as synonymous with "voting security" — in the Trusts' view — would create a conflict between Section 18(i) and Section 12(d) of the ICA. (*See* Dkt. No. 39 at 13–15.) Section 12(d), which regulations "fund of funds" arrangements, prevents funds from acquiring more than three percent of a registered investment company's "voting stock." 15 U.S.C. § 80a-12(d)(1)(A)(i). Section 12(d), however, limits share *acquisition* by investment companies; it does not shed light on the meaning of Section 18(i), which guarantees *voting rights* for all common shares.

It is true, as the Trusts point out, that Section 12(d) contains an exception providing that a fund may exceed the three-percent limit if the fund votes its stock in accordance with instructions from its clients or in the same proportion as the vote of all other holders (known as a "mirror vote"). 15 U.S.C. § 80a-12(d)(1)(E)(iii)(aa). The Trusts argue that this exception

5

embedded in Section 12(d) amounts to a restriction on "voting stock," and that its presence in a neighboring provision of the statute undermines Saba's interpretation of Section 18(i). This argument is unpersuasive for several reasons. First, the exception buried in Section 12(d) provides a *condition* under which a fund can avoid the *ownership restriction*; it is not itself a restriction on voting stock. Second, the two restrictions are different in nature. Section 12(d)'s exception addresses *how* a fund-shareholder can exercise its stock's voting rights, but it does not strip a fund-shareholder of its ability to vote. Under Section 12(d)'s exception, the stock of a fund-shareholder still presently entitles the fund to vote, in accordance with the ICA's definition of "voting security." The same cannot be said of the control share amendment, which creates stock that does not presently entitle its holder to vote if the holder has a control share. Third, even if there were a theoretical conflict between the Section 12(d) exception and Section 18(i)'s plain text, there would still be no actual conflict, because Section 18(i) expressly provides that where "otherwise required by law" its "equal voting" requirements do not apply. 15 U.S.C. § 80a-18(i). In the end, nothing in Section 12(d) provides a justification for ignoring the plain language of Section 18(i).

The Trusts' remaining arguments are equally unavailing. The Trusts rely on a May 27, 2020 SEC Staff Statement ("2020 Statement") as persuasive authority supporting their contention that the control share amendment does not run afoul of the ICA. (*See* Dkt. No. 39 at 21–24.) The 2020 Statement addresses the "intersection between state control share acquisition statutes ('control share statutes') and the voting requirements of section 18(i) of the Investment Company Act of 1940." (Dkt. No. 40-8 at 1.) In the 2020 Statement, the SEC staff recommends a "no-action" position in response to closed-end funds' opting into control share statutes, which operate similarly to the control share amendment here. The 2020 Statement also "withdraw[s]" a

2010 SEC no-action letter (the "Boulder Letter"), which had opined that opting into control share statutes by closed-end funds was inconsistent with Section 18(i). (*See id.*) The 2020 Statement, by its own terms, has "no legal force or effect." (Dkt. No. 40-8 at 2.) Nor does it contain any legal analysis of Section 18(i). This contrasts with the Boulder Letter, which examined the Investment Company Act in detail and explained why closed-end funds opting into control share statutes violated the plain language of both Section 18(i)'s "voting stock" and "equal voting rights" requirements. *See Boulder Total Return Fund, Inc.*, S.E.C. No-Action Letter, 2010 WL 4630835, *4–10. Moreover, this case involves a company's control share by-law, not a statute. The 2020 Statement does not provide any persuasive authority for the Trusts' position.

Similarly, none of the cases cited by the Trusts, all decided out of this circuit, have held that control share provisions are consistent with Section 18(i)'s requirements. (*See* Dkt. No. 39 at 17–20.) The sole case interpreting Section 18(i) that the Trusts cite, *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, held that a company adopting a "poison pill" measure — which entitled non-control shareholders to purchase additional shares at a lower price than control shareholders — was consistent with Section 18(i). *See* 342 F. Supp. 2d 371, 375–76 (D. Md. 2004). But, as that court observed, the poison pill measure "d[id] not revoke voting rights from any shares," *id.* at 376, unlike the control share amendment here.

The Court is also unconvinced by the Trusts' argument that the control share amendment is consistent with Section 18(i) because it strips voting rights from *shareholders* but not from *shares*. To be sure, Section 18(i) requires that "every share of stock" be voting stock, as opposed to requiring that every shareholder be able to vote. But this is a meaningless distinction. What makes a stock "voting" hinges on the ability of its holder to *presently* vote the stock, instead of a quality or status of the stock separate from its holder. Depriving a control shareholder of her

ability to vote her stock, even temporarily, necessarily means that her stock cannot be considered a "voting security" as the ICA defines the term. *See* 15 U.S.C. § 80a-2(a)(42); *see also Boulder Total Return Fund, Inc.*, S.E.C. No-Action Letter, 2010 WL 4630835, *10–11 (rejecting the distinction between stripping rights from shares and shareholders, and stating that "[a]ny interpretation of Section 18(i) that envisages personal discrimination against an investment company shareholder would be flatly inconsistent with the purposes of Sections 18(i)"). The fact that a control shareholder can transfer some of her stock to a different holder, who can vote the stock without restriction if his newly acquired stock does not make him a control shareholder, is irrelevant. Under the ICA, stock must *presently* entitle its holder — non-control shareholder and control shareholder alike — to vote.

In addition to violating Section 18(i)'s requirement that every share of stock be voting stock, the control share amendment also violates Section 18(i)'s requirement that every share of stock "have equal voting rights with every other outstanding voting stock." 15 U.S.C. § 80a-18(i). The only court to consider the legality of an ICA-regulated company adding a control share provision to its by-laws, the exact circumstance here, held that the complaint plausibly alleged a violation of Section 18(i). *See Eaton Vance Senior Income Tr. v. Saba Cap. Master Fund, Ltd.*, No. 2084CV01533-BLS2, 2021 WL 2222812, at *6 (Mass. Super. Ct. Mar. 31, 2021). Judge Salinger noted that "[i]f a share cannot be voted by its present owner, then the voting right attached to that share is no longer equal to that attached to shares owned by investors that control a [non-control] share of the Trust's total beneficial interest." *See id.* This Court agrees. Under the Trusts' control share amendment, stock do not have equal voting rights: the voting rights of stock owned by control shareholders are inferior to the voting rights of stock owned by non-control shareholders. A control shareholder's stock can completely lose its voting

rights if the conditions within the control share amendment are not met; the same cannot be said of a non-control shareholder's stock. This asymmetry in voting rights runs afoul of Section 18(i)'s requirement of equal voting rights.

Because the Court concludes that the control share amendment is inconsistent with Section 18(i)'s requirement that every stock be voting stock and have equal voting rights, the Trusts' motion to dismiss Saba's rescission claim is denied.

### 2. Declaratory Judgment

The Trusts also move to dismiss Saba's declaratory judgment claim as premature because Saba does not allege that it acquired a control share after the adoption of the control share amendment. (*See* Dkt. No. 39 at 24–26.) When a party seeks a declaratory judgment that a contract is void or unlawful, as Saba does here, it must allege an "imminent attempt to enforce that contract" in order to present an "actual controversy." *Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 55 (2d Cir. 2010). Though federal courts have "long accepted jurisdiction" where a plaintiff's "self-avoidance of imminent injury is coerced by the threatened enforcement action of a private party," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 130 (2007) (citing *Am. Machine & Metals, Inc. v. De Bothezat Impeller Co.*, 166 F.2d 535 (2d Cir. 1948)), a plaintiff must allege more than conclusory allegations of imminence, *see Saleh v. Sulka trading Ltd.*, 957 F.3d 348, 256 (2d Cir. 2020) (stating that while the plaintiff need not "bet the farm, so to speak," the plaintiff's request for declaratory judgment was not sufficiently imminent because he had no "concrete plans about how his products will find their way to customers").

Saba has sufficiently pleaded an actual controversy here. Saba owns at least 9.9% of the outstanding shares of each of the Trusts (*see* Dkt. No. 1 ¶ 5), meaning that its acquisition of any additional stock would turn its stock into a control share subject to the control share amendment (*see* Dkt. No. 40-9 at 32). Saba further alleges that it would have acquired more shares of the

9

Trusts but for the control share amendment.  (*See* Dkt. No. 1 ¶ 29.)  That Saba did not actually acquire stock over the threshold after the Trusts' adoption of the control share amendment does not dilute the imminence of the controversy here — Saba has already suffered the injury of being unable to acquire additional shares that are voting stock with equal voting rights with every other outstanding stock.  And the law does not require that Saba first experience the further injury of actually purchasing stock with unequal voting rights to request declaratory relief.  The Court thus denies the Trusts' motion to dismiss Saba's declaratory judgment claim.

**III.    Summary Judgment**

    **A.    Legal Standard**

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if "it might affect the outcome of the suit under the governing law."  *Hurley v. Tozzer, Ltd.*, No. 15 Civ. 2785, 2018 WL 1087946, at *1 (S.D.N.Y. Feb. 26, 2018) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)).  The party moving for summary judgment bears the burden of showing that no genuine dispute of material fact exists, *id.*, and in assessing whether the movant has carried this burden, a court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his or her favor," *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 166 (S.D.N.Y. 2006).

    **B.    Discussion**

Having concluded that the control share amendment violates section 18(i)'s requirement that every stock be "voting stock and have equal voting rights with every other outstanding voting stock," a purely legal question, the Court also concludes that Saba is entitled to summary

10

judgment on both its rescission claim and its declaratory judgment claim. There is no factual dispute regarding the Trusts' adoption of the control share amendment or the contents of the control share amendment. The Trusts assert that there is a factual dispute over whether Saba's investment strategies are detrimental to the Trusts or the Trusts' long-term investors. The Trusts contend that these investment strategies, if detrimental, could justify the Trusts' adoption of the control share amendment in furtherance of the ICA's purpose of protecting investors. (*See* Dkt. No. 49 at 23–24.) But that factual dispute is not material. Section 18(i)'s requirements that every stock be voting and have equal voting rights are clear and unambiguous. The Trusts do not contest that Section 18(i) governs its by-laws. Whether Saba's investment strategies were detrimental to the Trusts does not change the fact that, under the control share amendment, control shareholders' newly acquired stock does not always presently entitle them to vote and that there are unequal voting rights among stock.

The Trusts also object that the Second Circuit has declared that summary judgment should be awarded only in the "rarest of cases" against a party that has not had the chance to conduct discovery. *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) (internal quotation marks omitted). While this is true, this is one of those rare cases — one limited to a pure question of law at the pre-discovery stage. The Court thus grants Saba's summary judgment motion on its rescission claim and declaratory judgment claim.

### IV.   Conclusion

For the foregoing reasons, the Trusts' motion to dismiss is DENIED and Saba's motion for summary judgment is GRANTED. Saba is granted judgment on its claim for rescission of the control share amendment and on its declaratory judgment claim; and it is hereby declared that the control share amendment violates Section 18(i) of the Investment Company Act of 1940.

The Clerk of Court is directed to close the motions at Docket Numbers 38 and 43 and to close the case.

SO ORDERED.

Dated: February 17, 2022
       New York, New York

_____
J. PAUL OETKEN
United States District Judge